# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

**HENNING MANAGEMENT L L C**            **CASE NO.  2:20-CV-00004**

**VERSUS**                              **JUDGE JAMES D. CAIN, JR.**

**CHEVRON U S A INC ET AL**             **MAGISTRATE JUDGE LEBLANC**

## MEMORANDUM RULING

Before the Court is a "Motion for Partial Summary Judgment on Claims Related to the 1941 Blowout" (Doc. 176) filed by Defendant, Chevron U.S.A. Inc. ("Chevron") wherein Chevron moves to dismiss, Plaintiff Henning Management, LLC's ("Henning") claims as time-barred.

## FACTUAL STATEMENT

On November 9, 2018, Henning, filed this lawsuit for damage allegedly caused by oil and gas operations on a 1,250-acre property (hereinafter referred to as the "Property") that Henning bought in February 2018. The operations at issue began in 1938 when the landowner, Calcasieu National Bank of Lake Charles ("Bank"), granted a mineral lease to Shell Petroleum Corporation.[1]

The mineral lease specifies that the lessee is to pay for damage to growing crops, and its does not include an express provisions requiring remediation of payment for other damage.[2] In January 1941, after receiving a sublease, Gulf Refining Company ("Gulf")

---

[1] Defendant's exhibit Doc. 1-2, p. 142-56.
[2] *Id.* ¶ 10.

began drilling the Calcasieu National Bank No. 1. (SN 25340) in the Southeast Quarter of Section 18, Township 11 South, Range 5 West.[3] The well blew out and caught fire on July 20, 1941, and it continued to burn until August 13, 1941, when it cratered, bridged over, and died.[4]

During this approximately three-week period, the well "was continuously erupting large volumes of salt water and sand mixed with distillate and other substances several hundred feet in the air," and the wind spread those substances over an area of about six miles.[5] Almost immediately after the blowout, numerous landowners and tenants in the area, including the Bank, complained about damage to their property, crops, and residences.[6]

Between October 1941 and July 1943, Gulf executed no fewer than seven settlements relating to the blowout with other landowners and tenants in the area.[7] The settlements with the Bank were executed in stages. In October 1941, the Bank agreed to fully compromise and settle "any and all claims" of "every kind, character and description whatsoever" for damage to its "land, crops and personal property" related to the blowout, "whether said damage [was] known or unknown;" additionally, the Bank expressly reserved whatever claims it may have for damage to "the real property and the improvements thereon, other than the crops."[8]

---

[3] Defendant's exhibit B; see also Defendant's exhibit A.
[4] Defendant's exhibit B, at Henning II_KM_LDNR_000012-000024.
[5] *Watkins v. Gulf Refin. Co.*, 20 So.2d 273, 279-80 (La. 1944).
[6] Defendant's exhibit C.
[7] Defendant's exhibits D and T.
[8] Defendant's exhibit D-6.

Later, in July 1943, the Bank agreed to fully compromise and settle any and all claims for damage related to the blowout, known or unknown, to "residences, other buildings, fences and other improvement;" again, the Bank reserved any claims it had for damage "to [the] land."[9] In September 1943, the Bank granted Gulf an extension of the mineral lease.[10]

Before selling the subject property to Willard E. Walker ("Walker") in 1946, the Bank Indicated that it was "satisfied" with the operations on the subject property.[11] In an October 1946 letter, S. Arthur Knapp summarized Gulf's operations and explained to Walker that the Calcasieu National Bank No. 1 "blow out" ... "had a very disastrous fire which cost [Gulf] a tremendous lot of money."[12]

In December 1946, Walker granted Gulf an extension of the mineral lease.[13] In a March 1956 letter, Walker's representative informed Walker that the subject property still had "quite a bit of waste land caused by an old Gulf Refining Company blowout well."[14] In December 1958, Walker granted Gulf a surface lease for a saltwater disposal system in the Southeast Quarter of Section 18, Township 11 South, Range 5 West, near the location where the blowout occurred.[15]

Walker and his successor company, Walker Louisiana Properties, conducted business and regularly communicated with Gulf for decades, including negotiating and

---

[9] Defendant's exhibit D-7.
[10] Doc. 1-2, pp. 66-75.
[11] Defendant's exhibit F.
[12] Defendant's exhibit H.
[13] Doc. 1-2, pp. 94-103.
[14] Defendant's exhibit I.
[15] Doc. 1-2, pp. 255-58.

receiving payments from Gulf for other instances of property damage, without mentioning damage caused by the blowout.[16]

Chevron sold its assets in the field and the leases at issue to Petrocana, Inc. ("Petrocana"), in 1991, and the sale required Petrocana and its assignees to assume Chevron's obligations and indemnify Chevron against any claims related to Chevron's operations on the property.[17] To guarantee performance of the obligations that Petrocana and its assignees assumed in the sale, Chevron required them to obtain a letter of credit in the amount of $88,000.[18]

In August 1991, when Petrocana informed Walker Louisiana Properties that it planned to clean up and restore areas of the property, Walker Louisiana Properties granted permission "to excavate and bury the non-salvageable junk and trash".[19] A representative of Walker Louisiana Properties inspected and approved that cleanup, leaving Petrocana to believe that "Chevron no longer [had] exposure to any conditions [on the property] requiring clean up," which Petrocana relayed to Chevron in October 1991.[20] Gulf agreed to a reduction in the letter of credit from $88,000 to $10,000.[21]

In April 2022, when Walker Louisiana Properties thought the mineral lease had expired as to the remaining acreage, its manager asked the current operator, United World

---

[16] Defendant's exhibits J, K, L, M, N, S and V.
[17] Defendant's exhibit U.
[18] *Id.* § 6.1.4.
[19] Defendant's exhibit O.
[20] Defendant's exhibit P, Letter dated October 25, 1991 from Petrocana to Chevron.
[21] Defendant's exhibit R.

Energy, to clean up the surface locations of three wells.[22] Henning purchased the property in 2018 and filed suit shortly after the purchase.

### SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

---

[22] Defendant's exhibit Q.

133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## LAW ANALYSIS

Chevron argues that Henning's blowout claims are barred as prescribed, and/or barred by waiver and estoppel.

In its opposition, Henning suggests that because Chevron would have the burden of proof on its affirmative defense, namely prescription, Chevron has the burden of producing competent summary judgment evidence to show when Henning acquired knowledge of its cause of action. Consequently, Henning maintains that Chevron must show by summary judgment evidence that Henning had knowledge more than ten years before suit for the contract claims and more than a year before suit for the tort claim.

Chevron argues that federal procedural law applies here, not state and thus, Henning's state law jurisprudence as to state-court procedures is clearly wrong. Chevron remarks that the Federal Rules of Civil Procedure do not recognize the peremptory exception of prescription or the accompanying state procedural framework, nor do the Federal Rules bend to state courts' interpretation of the state courts' summary judgment standards. Chevron does agree that its affirmative defense of prescription is a matter of

Louisiana substantive law but contends that the manner in which it is asserted and established is a matter of procedure and federal principles control.

Here, the Court agrees with Chevron that the manner in which its affirmative defense is asserted and established is a matter of procedure and federal principles control. *J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77, 78 (5th Cir. 1962); see also *Morris v. Equifax Info. Servs., LLC*, 457 F.3d 460, 472 n. 20 (5th Cir. 2006) ("The federal, rather than state, summary judgment procedure and standard applies....").

Ordinarily, the party pleading prescription bears the burden of proving that the plaintiff's claims have prescribed. However, once it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to prove either suspension, interruption, or some exception to prescription, utilizing one of any number of legal constructs including but not limited to the doctrine of *contra non valentem* and the theory of continuing tort. *Wilson v. Greenwich Ins. Co.*, 600 F.Supp.3d 702 (W.D. La. 04/29/2022) citing *Terrebonne Par. Sch.Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002) (citing *In re Moses*, 788 So.2d 1173-1177-78 (La. 2001); *Stett v. Greve*, 810 So.2d 1203, 1208 (La. App. 2 Cir. 2002); *Strata v. Patin*, 545 So.2d 1180, 1189 (La. App. 4 Cir. 1989). Here, because the pleadings show that more than one year (for tort) and ten years (for contract) have passed since the 1941 blowout, it is Henning's burden to demonstrate by competent summary judgment evidence that there is a genuine issue of material fact for trial.

*Personal right to sue*

Chevron maintains that Henning has no right to sue for the 1941 blow-out damage claim.  Chevron argues that property damage is a personal right that belongs to the person who owned the property when the damage was inflicted, and that right is not transferred to a subsequent owner absent a specific assignment citing *Guibeau v. Hess Corp.*, 854 F.3d 310, 312-13 (5th Cir. 2017). However, in its Reply brief, Chevron admits that Henning "is able to proceed in this matter solely because it obtained an assignment of its predecessors' personal right to sue for environmental damage."[23]

*Prescription*

Prescriptive statutes are strictly construed against prescription and in favor of the claim or cause sought to be extinguished by it; thus, if two possible constructions that which favors maintaining, as opposed to barring an action, should be adopted.  *Carter v. Haygood*, 892 So.2d 1261 (La. 1/19/05); *Bailey v. Khoury*, 891 So.2d 1268 (La. 1/20/05). Any doubt must be resolved  against the relief sought. *Dickerson v. Piccadilly restaurants, Inc.*, 785 So.2d 842 (La.App. 1 Cir. 12/22/00).

Chevron argues that it has met its burden on summary judgment by showing that the requisite time has elapsed (one for tort and ten for contract) between the time of the alleged damage-causing conduct and the filing of suit citing *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

---

[23] P. 3, ¶ B, Doc. 180.

Chevron maintains that because the prior landowners knew of the alleged damage caused by the blowout for nearly 80 years but chose not to file suit, any claims related to the blowout have prescribed. Chevron argues that it has shown that Henning's predecessors were well aware of the damage caused by the blowout. Chevron contends that Henning has failed on its burden of establishing exception to prescription—by *contra non valentem,* a continuing tort, or any other application of prescription.

In short, Henning maintains that there is a genuine issue of fact for trial as to knowledge that was known by Henning or the prior landowners of the contamination caused by the 1941 blowout, and that knowledge of contamination itself might not trigger the running of prescription. As to tort actions, Henning contends that prescription begins to run when a plaintiff has actual or constructive knowledge of the damage, the delict, and the relationship between them is sufficient to indicate to a reasonable person that he is the victim of a tort citing  *Beach v. Cont'l Cas. Co.*, 11 So.3d 715 (La. App. 3 Cir. 6/3/09). Henning contends as to contract claims, prescription begins to run when a plaintiff has actual or constructive knowledge that the contract has been breached and that the breach has caused damage citing *Landry v Blaise, Inc.*, 829 so.2d 661 (La. App. 4 Cir. 10/23/02).

Chevron maintains that Henning's actions sound in tort because Henning has not pointed to any specific contractual provision that Chevron allegedly breached.  Chevron suggests that whether a tort action (one-year) or a contract action (ten year), Henning's actions are prescribed.

Henning cites to a plethora of cases that find that summary judgment is rarely or seldom appropriate where a determination of a party's knowledge is based on subjective

facts. *Hogg v. Chevron USA, Inc.*, 45 So.3d 991, 999 (La. 2010);  *Conques v. Wal-Mart Stores, Inc.*, 779 So.2d 1094, 1100 (La. App. 3 Cir. 2/14/01); *Cunningham v. Northland Ins. Co.*, 769 So.2d 689, 693 (La.App 5 Cir. 9/14/00); *FMC Enterprises, LLC v. Prytania-St. Mary condominium Ass'n, Inc.*, 117 So.3d 217, 227 (La. App. 4 Cir. 5/15/13); *Dortch v. Rollins*, 113 So.3d 443, 447 (La. App. 2 Cir. 4/10/13).

As to Henning's *contra non valentem* claim, Henning submits an affidavit declaring that Thomas Henning, the corporate representative of Henning, had no knowledge of the 1941 blowout until April 7, 2022[24]—several years after the instant lawsuit was filed. Henning purchased the property in February 2018,[25] and this lawsuit was filed in state court on November 9, 2018; it was later removed to this Court. Mr. Henning claims that it was during a deposition by Chevron that he learned of the blowout. Prior to that day, he claims that after he purchased the property, he had heard of a sunken well that occurred on the property.[26]

Plaintiff also submits evidence that just prior to purchasing the property, Henning had a Phase I environmental assessment done, which was less than one year before suit was filed.  In that assessment, Henning presented that he had no knowledge of the "presence or likely presence of contamination on the property."[27] Thus, Plaintiff asserts that Mr. Henning had no knowledge of any contamination on the property, nor was he aware of the 1941 blowout.

---

[24] Plaintiff's exhibit 1, Henning Management LLC corporate deposition, pp. 113:1-114:19.
[25] Doc. 1-2, pp. 3-24.
[26] Plaintiff's exhibit 1, Henning deposition, pp. 113:1-114:19.
[27] *Id.* pp. 114:20-115:7.

Plaintiff further contends that even if Mr. Henning was aware of any contamination on the property, the trigger to start prescription is when a plaintiff has knowledge of an *actionable claim,* citing *Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 246 (La. 2010) quoting *South Central Bell Telephone Co. v. Texaco, Inc.*, 418 So.2d 531, 532 (La. 1982) and *Harvey v. Dixie Graphics, Inc.*, 593 so.2d 351, 354 (La. 1992) ("prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage.").

Chevron argues that it is not Henning's knowledge of the soil and groundwater contamination that commences the running of prescription, but it is the property's predecessors' knowledge that matters. Chevron contends that because Henning's prior owners had actual or constructive knowledge that was sufficient to trigger the running of prescription, prescription began to run regardless of what Henning knew and when Henning learned that information citing *e.g., N.S.Q. Associates. v. Beychok*, 659 So.2d 729, 734 (La. 9/5/95) (holding that "the relevant statute of limitations continues to run against an assignee according to the same rules that applied to the assignor").

Henning relies on *Trahan v. BP Am. Prod. Co.*, 209 So.3d 166 (La.App. 3 Cir. 12/7/16) *writ denied*, 216 so.3d 815 (La. 3/24/17) and *Hogg v. Chevron USA, Inc.*, 45 So.3d 991 (La. 7/6/10). In *Hogg*, plaintiffs sued for subsurface contamination caused by a leaking underground storage tank on neighboring property.  Two letters were sent to plaintiff from the Louisiana Department of Environmental Quality ("LDEQ"). Through the first letter, plaintiffs were informed that:

> Environmental contamination has been detected in the vicinity of Burt's Chevron," as a result "of leaking underground storage tank system." The letter stated the contamination was "detected in the subsurface soil and

> groundwater," migrating in a "west-northwesterly direction toward an unnamed stream that flow north of Gaines Avenue." LDEQ reported that water samples collected from the unnamed stream, which is located on the Hoggs' property, indicated "the presence of chemicals commonly found in gasoline (i.e. Benzene, Toluene, Ethylbenzene, Xylene)."

*Hogg*, 45 So.3d at 995.  The letter also explained that "[d]ue to the direction of groundwater flow, there is a possibility that gasoline may have migrated underground from the Burt's Chevron site to your property or that such migration may occur in the future."

The second letter conveyed to plaintiffs the results of ambient air sampling conducted as part of an ongoing investigation in the release at Burt's Chevron.  The sampling revealed the presence of chemicals associated with gasoline in the area adjacent to the unnamed stream.  Attached to the second letter was a map that revealed the tests were conducted on Hogg's property and based on the test results, LDEQ recommended that the landowners limit the time spent in the area immediately adjacent to the stream. *Id.*

The Louisiana Supreme Court relied upon *Campo v. Correa*, which defined constructive knowledge as "whatever notice is enough to excite attention and put the injured party on guard or call for inquiry." 828 So.2d 502, 510-511(La. 6/21/02).

The *Hogg* court found that the two letters provided plaintiffs with "sufficient knowledge to afford them a reasonable basis to pursue a claim for damages, and that plaintiffs' inaction in light of such knowledge was unreasonable. Furthermore, the court determined that with receipt of the second letter, the plaintiffs acquired constructive knowledge of the damage to their immoveable property sufficient to commence the running of prescription. *Id*. at 1001. The court also relied on *Jordan v. Employee Transfer Corp.*, (while prescription will not begin to run at the earliest possible indication that a plaintiff

may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to seek out those whom he believes may be responsible for a specific injury), 506 So.2d 420, 423 (La. 1987).

In *Trahan, supra,* the Third Circuit held that there were fact issues as to whether the landowners sustained damage that would lead them to investigate further into the cause of damage, as well as whether the landowners had actual or constructive knowledge of property damage. In making is prescription argument, BP relied on the deposition testimony of the plaintiffs who testified that: the "white sandy area" on the property had been there during the life of Plaintiff, Craig Vincent, and that he helped his father clean up the property back in the 1960s, which involved picking up leftover boards, pipes, sucker rods, and part of a tank. Plaintiff, Craig Vincent, worked in the oil and gas industry for approximately 40 years and remembered that grass would die if someone spilled produced water on the ground. Mr. Vincent also testified that the white sandy area on the property was consistent with produced water spills he observed while working in the oil and gas industry. Other plaintiffs testified that they had observed the white sandy area and one of the plaintiffs observed that it lacked vegetation. *Id.* at 173.

BP argued that the four plaintiffs who had seen the white sandy area had actual knowledge of damages sufficient to commence the running or prescription. The court found that there were genuine issues of material fact as to whether the landowners or their ancestors in title had actual or constructive knowledge of damage to their properties.

Here, as to Henning, there is deposition testimony that the first time Henning, or Mr. Henning, was aware of the 1941 blowout was after suit was filed.   As to the predecessors, Plaintiff contends that Chevron has not established that the previous landowners had sufficient knowledge of the damage caused by the blowout to trigger the running of prescription. The summary judgment evidence submitted by Chevron provides the following:

- On July 20, 1941, there was a well blowout that caused a fire;[28]

- The blowout caused a continuous eruption of large volumes of salt water and sand mixed with distillate and other substances several hundred feet in the air;[29]

- The wind spread those substances over a six-mile area, where they settled onto fields, buildings and equipment, allegedly causing damage;[30]

- The well continued to burn until August 13, 1941, when it cratered, bridged over, and died;[31]

- A letter from T.R. Deen, Jr. to Douglass Lanier dated July 29, 1941, refers to complaints shortly after the blowout by numerous landowners and tenants in the areas of damage to crops, residences and property;[32]

- In 1941, Gulf executed settlements with Bank in stages and agreed to fully settle all claims for damage related to the blowout, known or unknown;[33]

- Between 1941 and 1943, Gulf entered at least 38 settlements with nearly all landowners and tenants affected by the blowout;[34]

---

[28] Defendant's exhibit B.
[29] *Watkins v. Gulf Refin. Co.*, 20 So.2d 273, 279 (La. 1944).
[30] *Id.* p. 279-80.
[31] Exhibit B attached to Petition for Damages, doc. 1-2, pp. 37-41.
[32] Defendant's exhibit C.
[33] Defendant's exhibit D-6.
[34] Defendant's exhibit E.

- Gulf also settled with the Bank, but the Bank reserved whatever rights it had for damage to "the real property and the improvements thereon, other than the crops";[35]

- By 1943, the Bank had settled all claims except damage to the land itself and continued to do business and/or extend the mineral lease to Gulf;[36]

- Before selling to Walker, the Bank acknowledge that it was satisfied with Gulf's operation and the handling of the blowout aftermath;[37]

- An agent for Walker wrote him a letter in 1956 noting that the property had "quite a bit of waste land caused by an old Gulf Refining Company blowout well;[38]

- In 1964, Walker's agent complained to Gulf of its operations damaging crops and demanded damages;[39]

- In 1983, Walker's successor, Walker Louisiana Properties, settled all claims concerning a saltwater disposal line leak that caused damage;[40]

- In 1991, Chevron's successor, Petrocana Inc. wrote to Walker Louisiana Properties asking permission "to excavate and bury the non-salvageable junk and trash;"[41]

- Walker Louisiana Properties inspected and approved the clean-up by Petrocana, Inc, and in doing so, reduced Petrocana's $88,000 letter of credit to $10,000;[42]

- In 2002, Walker Louisiana Properties request that the current operator, United World Energy Corporation, clean up and restore the surface locations of three wells on the Property;[43]

---

[35] Defendant's exhibit D and D-6.
[36] Doc. 1-2, pp. 66-75.
[37] Defendant's exhibit F.
[38] Defendant's exhibit I.
[39] Defendant's exhibit M.
[40] Defendant's exhibit N.
[41] Defendant's exhibit O.
[42] Defendant's exhibits P and R .
[43] Defendant's exhibit Q.

Chevron argues that the above summary judgment evidence conclusively shows that the prior owners (the Bank and Walker) had actual knowledge of the damage caused by the 1941 well blowout, and yet did nothing to assert a damage claim. Chevron contends that the prior owners knew of the damage caused by the blowout, and because the right to sue for property damage is a personal right that belongs to the property owner at the time of the damage, Henning could not have received rights that the previous landowners themselves did not possess—because as to the previous owners, those rights had prescribed. See *Herlitz Constr. Co. v. Matherne*, 476 So.2d 1037, 1040 (La.App. Cir. 1985) (the assignee acquires no greater rights than the assignor had and is subject to all defenses available against the assignor). This means that the assignor's knowledge is imputed to the assignee, and prescription "continues to run against [the] assignee" as it had against the assignor. *Beychok*, 659 So.2d at 734.

Chevron relies on *Marin v. Exxon Mobil Corp.*, 48 So.3d 234, 246 (La. 2010), wherein prescription began when the plaintiffs learned that "sugarcane would not grow in certain areas," even though they did not know at that time that "the land was contaminated with oilfield wastes." *Id.* at 248-49. Thus, when plaintiff discovered the sugarcane would not grow, this was enough to prompt them to investigate further to learn the nature of the damage to their property. *Id.* at 251.

Henning, on the other hand, contends that the prior owners did not have sufficient knowledge or notice to excite inquiry regarding a possible claim, citing *London Towne Condo. Homeowner's Ass'n v. London Towne Co.*, 939 So.2d 1227, 1234 (La. 10/17/06). The summary judgment evidence clearly shows that there was a blowout in 1941, to which

all of the ancestors in title were aware.  It also shows that there was damage to crops, buildings, and structures to neighboring properties. The subject property was cleaned up several times by the relevant operators with complete satisfaction of the landowners. However, there is no evidence that the landowners had actual or constructive knowledge that the groundwater contained contaminants. To be sure none of the summary judgment evidence submitted by Chevron even mentions groundwater contamination. Henning submits an affidavit that he had no knowledge of the 1941 blowout, or that the property he purchased was contaminated to the extent that he had a possible claim for damage.[44] As such, the Court finds that Chevron has not met its burden of proving that Henning's action(s) are prescribed.

Next, Chevron moves to dismiss based on prescription any claims Henning may have under the Code articles governing leases.

Louisiana Civil Code articles 2683(a)-(2) and Louisiana Revised Statute § 31:122 impose obligations that are enforceable during the lease. Louisiana Civil Code article 2683(3) requires a lessee to return the property in the same condition as it was at the time of the lease, less normal wear and tear. However, this obligation is enforceable at the end of the lease. Thus, a lessor cannot sue until the lease terminates.

Chevron argues that Henning's predecessors sat on their right to sue for land damage under the Louisiana Civil Code articles and the Mineral Code, arising from the 1941 blowout for over seven decades, thus the claims are prescribed and should be dismissed.

---

[44] Plaintiff's exhibit 1, Hennington deposition.

Henning argues that until the lease at issue terminates, prescription has not begun to run. The Court agrees that as long as there is an active lease on the property, prescription has not begun to run as to any claims under the Code articles governing leases.

*Waiver and estoppel*

Chevron maintains that Henning's claim under Louisiana Civil Code article 2683(3) is barred by waiver and estoppel. Chevron asserts that Bank and Walker could have acquired the right to sue and because they chose not to sue, they have waived any blowout-related claims.

Waiver is an "intentional relinquishment of a known right." *Arceneaux v. Amstar Corp.*, 2010-2329 (La. 7/1/11), 66 So. 3d 438, 450. To effect waiver, there must first be an existing right and knowledge of its existence. A party may then waive that right through (1) "an actual intention to relinquish it," or (2) "conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Id.* at 450–51. Thus, waiver may be "expressed or implied." *Ratcliffe v. Acacia Mut. Life Ins. Co.*, 187 So. 329, 331 (La. App. Orleans 1939).

Chevron suggests that the Bank knew about its right to sue for land damage caused by the blowout and chose not to prosecute. Also, when Walker purchased the property, he was assigned that right and also chose not to prosecute. Thus, Chevron contends that due to these property owners' inaction, they waived their right to sue because that inaction was inconsistent with any intent to enforce their right to sue, citing *Bott v. J.F. Shea Co.*, 388 F.3d 530, 533 (5th Cir. 2004) ("Silence or inaction, for so long a period as to show an

intention to yield a known right, " is sufficiently "inconsistent with the intent to enforce" a right to prove a waiver of that right).

Chevron remarks that Bank and Walker allowed Gulf to continue operating on the property after they became aware of damage caused by the blowout, and then granted multiple extensions of the original mineral lease and granted Gulf new surface and mineral leases on the property. Yet, the Bank never complained to Gulf about land damage caused by the blowout, and there are no records of the Bank or Walker asking Gulf to pay for land damage. There are records that indicate that the Bank and/or Walker negotiated and received payments from Gulf for other instances of damages over the years.[45] Thus, Chevron maintains that the Bank and Walker's failure to sue for the alleged damage is a waiver.

It is interesting to this Court that the prior landowners demanded and received payments from Gulf for other instances of damages over the years, they inspected the property several times to their complete satisfaction after the operators cleaned up the property, but there is no mention anywhere in this record by any of the prior landowners complaining of groundwater contamination on the property. Thus, one could easily infer that the landowners' alleged inaction was because they were not aware of the groundwater contamination. It is beyond reason for one to consistently require cleanup and/or damage to the property, and yet forget to mention and/or pursue cleanup or remediation damage for any groundwater contamination. A more logical explanation would be that the landowners,

---

[45] Defendant's exhibits T, M, and N.

including the current landowner had no knowledge of the groundwater contamination.  As such, Chevron's waiver argument fails.

Finally, Chevron argues that Henning should be estopped from asserting its claims here. Equitable estoppel precludes a party from asserting an otherwise available claim against someone who has detrimentally relied on that party's conduct. *Am. Bank & Tr. Co. v. Trinity Universal Ins. Co*., 205 So. 2d 35, 40 (La. 1967). The doctrine is designed to prevent injustice by barring a party "from taking a position contrary to his prior acts, admissions, representations, or silence." *Id*. Equitable estoppel has three elements: (1) a representation by conduct or word by the person sought to be estopped, (2) justifiable reliance thereon, and (3) a change in position because of that reliance to the detriment of the party asserting estoppel. *Bottsouth Advert. & Publ'g Corp. v. Gassenberger*, 565 So. 2d 1093, 1095 (La. App. 4 Cir. 1990).

Although waiver and estoppel are similar, the two are distinguishable. Waiver occurs when a party's silence shows an intent to relinquish a right, *Arceneaux v. Amstar Corp.*, 66 So. 3d 438, 450 (La. 7/1/11), whereas estoppel applies when the other party reasonably relied on that silence to its detriment, *Trinity Universal*, 205 So.2d at 40.

Chevron argues that because the operators continued to give assurances that it had completed the cleanup and restoration of the production facilities near the blowout and the landowners inspected and approved the work (for example, "Chevron no longer [had] exposure to any conditions [on the property] requiring clean up."),[46] the Bank and Walker's

---

[46] Defendant's exhibit P.

prolonged silence indicated that they would not seek to enforce any right against Gulf related to the alleged damage caused by the blowout.  Chevron then suggests that it had a right to rely on Bank and Walker's representations and reasonably believed that any unreleased claims that they had for land damage had been waived. As such, Chevron changed its position to its detriment by agreeing to reduce the letter of credit, which was meant to guarantee performance of the obligations that Petrocana and United World assumed in the sales, including the obligation to indemnify Chevron against the claims in this lawsuit.[47]

As to Chevron's estoppel arguments, again, Chevron's position is based on actual knowledge by the landowners, which this Court has determined did not exist. Also, in its prior arguments Chevron repeatedly relies on statements by the prior landowners that it reserved it rights as to any damage claims.  The Court finds that Chevron's estoppel argument likewise fails.

## CONCLUSION

For the reasons explained herein, the Court will deny Chevron's Motion for Partial Summary Judgment on Claims Related to the 1941 Blowout (Doc. 176).

**THUS DONE AND SIGNED** in chambers on 19th day of August, 2024.

JAMES D. CAIN, JR.
**UNITED STATES DISTRICT JUDGE**

---

[47] Defendant's exhibit R.